# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CESAR RUIZ (M45835),
       Petitioner

    v.

CHARLES TRUITT,
         Respondent

No. 23 CV 2458

Judge Jeremy C. Daniel

## MEMORANDUM OPINION AND ORDER

Following a jury trial in the Circuit Court of Cook County, Petitioner Cesar Ruiz was convicted of first-degree murder and sentenced to seventy-five years' imprisonment for his role in the beating death of four-year-old Christopher Valdez. Ruiz seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He contends that he was denied his right to effective assistance of both trial and appellate counsel, and challenges the constitutionality of his sentence. For the reasons below, the Court denies the petition and declines to issue a certificate of appealability.

## BACKGROUND[1]

### I.    TRIAL

On November 25, 2011, what would have been Christopher Valdez' fourth birthday, relatives found his dead body in the bed that Ruiz shared with Christopher's

---

[1] The background facts are drawn from the state court record, (R. 13), and from the Illinois Appellate Court's opinions on direct appeal, *People v. Ruiz*, 2018 IL App (1st) 152458-U, and postconviction review. *People v. Ruiz*, 2022 IL App (1st) 190947-U. The Court presumes that the state court's factual determinations are correct as Ruiz does not point to clear and convincing evidence to the contrary. *See Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020) (citing 28 U.S.C. § 2254(e)(1); *Perez-Gonzalez v. Lashbrook*, 904 F.3d 557, 562 (7th Cir. 2018)).

mother, Crystal Valdez. *People v. Ruiz*, 2018 IL App (1st) 152458-U, ¶¶ 2, 4. Ruiz and Crystal were jointly indicted, but tried separately, for Christopher's murder. *Id.* ¶ 2. The evidence presented at Ruiz' trial is summarized as follows.

At the time of the murder, Crystal lived with her two children, Christopher and five-year-old Christine in a small coach house located on the property of Ruiz' cousin, Fernando. *Id.* ¶ 4. Ruiz lived with them too, having moved in a few months earlier when he started dating Crystal. *Id.* During those few months, Crystal's relationship with her family began to deteriorate. *People v. Ruiz*, 2022 IL App (1st) 190947-U, ¶ 7. Testimony from Crystal's brother, Joe, and his wife, Katrine, attributed the fraying relationship to the family's dislike of Ruiz, their perception that Ruiz was controlling and sought to isolate Crystal from them, and the suspicion that Christopher was being physically abused, though the family's concern in this regard appeared to be focused on Crystal. *Id.*

On Thanksgiving, the day before Christopher's death, Ruiz and Crystal took the children to Fernando's house on the front of the property to celebrate with him and his wife, Marilu. *Id.* ¶ 8; *Ruiz*, 2018 IL App (1st) 152458-U, ¶¶ 4, 6. Based on Marilu's testimony, Christopher was already showing signs of physical abuse. *Ruiz*, 2018 IL App (1st) 152458-U, ¶¶ 6–7. The left side of his face was bruised, and he had bruises all over his back and chest, which Crystal revealed to Marilu when Ruiz stepped out to retrieve something from the coach house. *Id.* Marilu testified that Christopher was withdrawn; he did not speak or eat, though he perked up briefly

2

when Ruiz stepped out. *Id.* ¶ 7. At some point, Christopher vomited at which time Ruiz took him back to the coach house for the remainder of the evening. *Id.* ¶ 8.

Christopher's body was found around 2:00 p.m. the next day when Joe and Katrine went to the coach house to check on him, having received a concerning call from Marilu about the evening prior. *Id.* ¶ 9. When they arrived, Crystal and Ruiz stretched and yawned as if they had just woken up, though both were fully dressed. *Id.* ¶¶ 9–10. The house was in disarray; the closets had been emptied and plastic totes filled with clothing were strewn about. *Id.* ¶ 10. Crystal initially tried to prevent Joe and Katrine first from coming inside and then from entering the bedroom, but they pushed their way past her. *Id.* ¶¶ 9–11. They found Christopher rolled up in a blanket on the bed. *Id.* ¶ 11. He was not responsive and covered in bruises. *Id.*

Joe punched Crystal in the face, and Katrine asked, "What did you do?" *Id.* ¶ 12. Crystal answered, "It was him" (according to Joe), or "He did it" (according to Katrine). *Id.* Ruiz retorted, "And so did you," to which Crystal said, "No it was you." *Id.* Ruiz then said, "You helped me" and "She hit him first." *Id.* Joe grabbed Ruiz, pushed him against the wall, and punched him until he fell to the floor. *Id.* ¶ 13. As Joe hit him, Ruiz apologized and said it was an accident. *Id.* Joe eventually relented after Katrine intervened and called 911. *Id.*

Paramedics and police arrived soon after. *Id.* ¶ 14. The paramedics noted that rigor mortis and lividity had set into Christopher's body, indicating that he had been dead for at least two hours, if not more. *Id.* They also observed that many of Christopher's bruises were covered with what appeared to be a flesh-toned makeup.

3

*Id.* Katrine found two bottles of cover-up makeup in the bedroom, which she turned over to the police. *Id.*

Ruiz and Crystal were arrested and separately interrogated later that day. *Id.* ¶ 15. Both a video and a transcript of Ruiz' interrogation were admitted into evidence and published to the jury. *Id.* ¶ 15. During the interrogation, detectives told Ruiz that Crystal had accused him of striking Christopher. *Id.* ¶ 25. Ruiz, for his own part, eventually admitted to his complicity in the murder, describing how he struck Christopher in various places and in various ways that evening. *Id.* ¶¶ 17–21. He explained that, after Crystal returned home from Fernando and Marilu's on Thanksgiving, she "blew up" at him, as she was prone to do, and he "[f]inally lost it." *Id.* ¶¶ 17, 20. He punched (and broke) the bedroom wall, and threw Crystal's cellphone into a bucket of water. *Id.* ¶ 20.

Amidst the commotion, Christopher got out of bed. *Id.* ¶ 21. Ruiz said he initially spanked Christopher on the bottom and said, "I thought you were sick go to bed." *Id.* He eventually revealed that he also grabbed Christopher by the arm "kind of tight," pulled his hair from the back while spanking him, struck him on the right side of his ribcage with multiple underarm swings, and lifted the child by the arms to put him back to bed. *Id.* He "might have" also hit Christopher in the stomach but couldn't remember. *Id.* In describing the incident, Ruiz made statements that he went "too far," that he "didn't hit [Christopher] with all [his] might but it wasn't a soft tap either," and that he didn't "even recall doing as much as what [he] did." *Id.* ¶¶ 17, 21.

After the detectives left, Ruiz sat alone in the interrogation room and said to himself, "F***. What the f*** is wrong with me." *Id.* ¶ 26.

During a post-mortem examination, Dr. Laura Moser-Woertz, an assistant medical examiner, found notable injuries on Christopher's body that were consistent with the blows that Ruiz admitted delivering. *Id.* ¶¶ 28–30. Dr. Moser-Woertz testified that Christopher had bruises and abrasions all over his face and body, including his buttocks, back, ribcage, abdomen, and ears. *Id.* ¶ 29. The injuries on his ribcage were evenly distributed, suggesting Christopher may have been thrown against a wall. *Id.* The fingerprint-size bruises on his right abdomen appeared to be imprints left by someone who grabbed Christopher forcefully in that area. *Id.* And the bruises and scrapes behind the child's ears were consistent with forceful hair or ear pulling. *Id.*

Dr. Moser-Woertz testified that Christopher suffered significant internal injuries as well, including damage to his organs and internal bleeding. *Id.* ¶ 30. His internal injuries were consistent with an adult forcefully striking Christopher on his right side. *Id.* Christopher also had bruising on his scalp, brain swelling, and bleeding in his spinal column that was likely caused by trauma to his back. *Id.* Dr. Moser-Woertz opined that Christopher sustained a total of fifty-four blunt-force injuries, both internal and external, all of which contributed to his death. *Id.* ¶¶ 28, 31.

For his defense, Ruiz testified that Crystal was Christopher's sole abuser. *Id.* ¶ 33. He contradicted many of the admissions that he made during his interrogation, insisting that he only grabbed Christopher's arm that night and spanked him with

"three swats" on his right buttock. *Id.* ¶ 36. He added that he grabbed Christopher by the hair and yanked his arm on cross-examination. *Id.* Ruiz denied that Christopher was injured as severely as the post-mortem photos depicted but that he did notice bruising on Christopher's eye and forehead. *Id.* ¶ 37. On cross-examination, he acknowledged that he put makeup on Christopher's face to hide the bruises because he planned to take him out for his birthday that day. *Id.* He did so to avoid any trouble for himself or Crystal, who already "had a case" involving battery and child endangerment. *Id.*

In closing, the State argued that Ruiz and Crystal both contributed to Christopher's fatal injuries and were both guilty of his murder. *Ruiz*, 2022 IL App (1st) 190947-U, ¶ 18. To that end, the jury was instructed that, to find Ruiz guilty, it only had to find that his "acts were a contributing cause of [Christopher's] death" but not necessarily "the sole and immediate cause of [his] death." *Id.* (citing Illinois Pattern Jury Instruction, Criminal (4th) No. 7.15). The jury was also instructed on accountability, as the State argued, in the alternative, that Ruiz was accountable for Crystal's acts of violence against Christopher. *Id.* The jury returned a general verdict of guilty on one count of first-degree murder.[2] *Id.* Because Christopher was under twelve years of age, the trial court found that Ruiz was eligible for an extended-term sentence. *Ruiz*, 2018 IL App (1st) 152458-U, ¶ 41. He was sentenced to seventy-five years' imprisonment. *Id.*

---

[2] A separate jury returned a general verdict of guilty against Crystal. *Ruiz*, 2022 IL App (1st) 190947-U, ¶ 18.

## II.    DIRECT APPEAL

Ruiz appealed his conviction, arguing that the State's admission of Crystal's custodial statement accusing Ruiz of striking Christopher violated his Sixth Amendment right of confrontation. (R. 13-2 at 28–39.) Because Ruiz failed to preserve the issue for appeal, the Illinois Appellate Court reviewed his claim under Illinois' plain-error doctrine.[3] *Ruiz*, 2018 IL App (1st) 152458-U, ¶ 72. The state appellate court affirmed Ruiz' conviction, holding that, while it was error to admit Crystal's statement, the error did not require reversal given that the statement, at best, played only a peripheral role in the State's case. *Id.* ¶¶ 81–83, 89. Ruiz did not file a petition for leave to appeal ("PLA") to the Illinois Supreme Court. (R. 1 at 2.)

## III.    POST-CONVICTION PROCEEDINGS

Upon conclusion of direct review, Ruiz sought post-conviction relief from the state courts. In his *pro se* petition for post-conviction relief, Ruiz argued that (1) trial counsel was ineffective for failing to: (a) introduce an audio recording of Joe's 911 call wherein Crystal can be heard admitting to killing Christopher; (b) introduce evidence that Crystal had previously abused Christopher; and (c) object to evidence that Ruiz abused Crystal and isolated her from her family; (2) direct appeal counsel was ineffective for failing to raise claims 1(b) and 1(c) on direct appeal; and (3) his sentence was unconstitutionally disproportionate compared to Crystal's sentence. (R. 13-11 at

---

[3] Illinois' plain-error doctrine allows a reviewing court to consider an unpreserved claim when there is a clear or obvious error and (1) the evidence is closely balanced or (2) the error is so serious that it affects the fairness of the defendant's trial. *See People v. Piatkowski*, 870 N.E.2d 403, 410–11 (Ill. 2007).

86–90.) The circuit court summarily dismissed his petition at the first-stage or proceedings.[4] (R. 13-12 at 5–11.)

Ruiz, with the assistance of counsel, appealed the dismissal of his ineffective assistance of trial counsel claim based on the failure to introduce the 911 call, as well as his claims of ineffective assistance of trial and appellate counsel concerning the failure to object to evidence regarding Ruiz' abuse of Crystal. (R. 13-6 at 19–27.) The Illinois Appellate Court affirmed the circuit court's dismissal of his post-conviction petition, holding that Ruiz could not show that he was prejudiced by any of the claimed attorney errors. *Ruiz*, 2022 IL App (1st) 190947-U, ¶¶ 37, 42, 44.

Ruiz filed a *pro se* post-conviction PLA to the Illinois Supreme Court, wherein he renewed his claims of ineffective assistance of trial and appellate counsel that he raised on post-conviction appeal. (R. 13-10 at 11–20.) He also submitted an additional ineffective assistance claim, arguing that his post-conviction appellate counsel was ineffective in failing to raise his sentencing challenge on post-conviction appeal. (*Id.* at 7–10.) The Illinois Supreme Court denied his post-conviction PLA. *People v. Ruiz*, No. 12-8452, 197 N.E.3d 1131 (Ill. Sept. 28, 2022) (Table).

---

[4] In Illinois, "[p]ost-conviction petitions are adjudicated through a three-stage process set forth by the Post-Conviction Hearing Act[,] 725 ILCS 5/122-1 *et seq.*" *People v. Gardner*, 810 N.E.2d 180, 184 (Ill. App. Ct. 2004). "In the first stage, the petition must state the gist of a constitutional claim or it will be summarily dismissed . . . At the second stage, the petitioner must make a substantial showing of a constitutional violation to survive dismissal. Only then will the petition advance to the third stage, an evidentiary hearing." *Id.* (citing *People v. Edwards*, 757 N.E.2d 442, 446 (Ill. 2001)).

## IV.    HABEAS PROCEEDINGS

Following the conclusion of his state-court proceedings, Ruiz filed a petition under 28 U.S.C. § 2254 seeking habeas corpus relief from this Court. (*See* R. 1.) His habeas petition raises the following claims:

> (1)    his sentence is unconstitutionally disproportionate compared to Crystal's sentence;
>
> (2)    ineffective assistance of trial counsel for failing to: (a) introduce the 911 audio recording; (b) object to evidence that Ruiz isolated Crystal from her family; and (c) introduce evidence of Crystal's prior abuse of Christopher; and
>
> (3)    ineffective assistance of appellate counsel for failing to raise each of the foregoing errors of trial counsel on direct appeal (the Court refers to these corresponding claims as Claims 3(a)–(c), respectively).

(*Id.* at 5–17.)

The respondent argues that Ruiz is not entitled to habeas corpus relief because his claims are either procedurally defaulted or meritless. (R. 12 at 8–20.) For the reasons discussed below, the Court agrees.

## LEGAL STANDARD

Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), provides the statutory authority for federal courts to grant habeas corpus relief to individuals in state custody. *Pierce v. Vanihel*, 93 F.4th 1036, 1044 (7th Cir. 2024). Under the AEDPA, federal habeas corpus relief is not warranted unless "the state court's adjudication of the claim (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the

Supreme Court, or (2) was based on an unreasonable determination of the facts." *Id.* (citing 28 U.S.C. § 2254(d); *Schmidt v. Foster*, 911 F.3d 469, 476 (7th Cir. 2018) (en banc)). "A state court's determination is 'contrary to' clearly established law if it applies a rule that contradicts the law." *Reyes v. Nurse*, 38 F.4th 636, 647 (7th Cir. 2022) (citing *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011)). If the state court identifies the proper law, the inquiry then turns to whether the state court's application of that rule was unreasonable, that is whether "there was no reasonable basis for the state court's decision." *Id.* (quotation marks and citations omitted).

This "difficult to meet" and "highly deferential standard" reflects the view that "habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Minnick v. Winkleski*, 15 F.4th 460, 468 (7th Cir. 2021) (quotation marks and citations omitted). In applying this standard, the Court looks to the "last reasoned state court decision to decide the merits of the case, even if the state's supreme court then denied discretionary review." *Pierce*, 93 F.4th at 1044–45 (quotation marks and citations omitted).

## ANALYSIS

### I. PROCEDURAL DEFAULT

The respondent first argues that the Court cannot review several of Ruiz' claims on the merits because they are procedurally defaulted. (R. 12 at 8–12, 18–19.) Procedural default can occur in various ways, but "two are paradigmatic" on habeas corpus review. *Clemons v. Pfister*, 845 F.3d 816, 819 (7th Cir. 2017) (citing *Richardson v. Lemke*, 745 F.3d 258, 268 (7th Cir. 2014)). First, procedural default can occur if

10

"the state court rejects a federal claim based on a state procedural rule 'that is both independent of the federal question and adequate to support the judgment.'" *Id.* (quoting *Richardson*, 745 F.3d at 268). Second, a state prisoner can procedurally default a federal claim "if he fails to 'fairly present' it 'throughout at least one complete round of state-court review, whether on direct appeal of his conviction or in post-conviction proceedings.'" *Id.* (quoting *Richardson*, 745 F.3d at 268). This latter form of procedural default is relevant here.

### A.    Failure to Exhaust

The respondent argues that Ruiz failed to raise his sentencing challenge (Claim 1); his ineffective assistance of trial and appellate counsel claims concerning the failure to introduce evidence of Crystal's prior abuse (Claims 2(c) and 3(c)); and his ineffective assistance of appellate counsel claim regarding trial counsel's deficiencies as to the 911 audio recording (Claim 3(a)) through one complete round of state court review. (R. 12 at 8–12, 18–19.)

Beginning with his sentencing claim, Ruiz challenged the constitutionality of his sentence for the first time in his *pro se* post-conviction petition. (R. 13-11 at 89–90.) He did not, however, present this claim to the Illinois Appellate Court on post-conviction appeal. (*See* 13-6 at 19–27.) That omission renders his claim procedurally defaulted. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("State prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."). The fact that Ruiz later argued, in his *pro se* post-conviction PLA, that the claim was not raised due to error on the part of his post-conviction appellate counsel does not

11

cure the default. (*See* R. 13-10 at 7–10.) There is no Sixth Amendment right to counsel on collateral review, so "ineffective assistance in those proceedings does not qualify as cause to excuse a procedural default." *Davila v. Davis*, 582 U.S. 521, 524 (2017) (citing *Coleman v. Thompson*, 501 U.S. 722 (1991)); *see also Crutchfield v. Dennison*, 910 F.3d 968, 973 (7th Cir. 2018). Claim 1 is therefore procedurally defaulted.

Next are Claims 2(c) and 3(c)—Ruiz' claims of ineffective assistance of trial and direct appeal counsel concerning the failure to introduce evidence of Crystal's prior abuse of Christopher. Ruiz raised these claims in his *pro se* postconviction petition, (R. 13-11 at 87–88), but he did not present them to the state appellate court or the state supreme court in his post-conviction appeal or post-conviction PLA. (*See* 13-6 at 19–27; 13-10 at 7–20.) Because these claims were not raised through one complete round of state-court review, they are procedurally defaulted. *See Boerckel*, 526 U.S. at 845. The same is true for Claim 3(a)—Ruiz' claim faulting direct appeal counsel for failing to challenge his trial attorney's failure to introduce the 911 audio recording— as this claim was never argued in state court. *Id.* Claims 2(c), 3(a), and 3(c) are therefore procedurally defaulted.

## B. Exceptions to Procedural Default

Ruiz argues that, even if his claims are procedurally defaulted, the defaults should be excused. Procedural default as a barrier to reaching the merits of a claim (and, consequently, to habeas relief) is subject to two potential exceptions: "(1) cause for the default and actual prejudice" or (2) a showing that the "failure to consider the claims will result in a fundamental miscarriage of justice[,]" *i.e.,* a showing of actual

innocence. *Thomas v. Williams*, 822 F.3d 378, 386 (7th Cir. 2016) (citing *Coleman*, 501 U.S. at 750). Ruiz cannot establish either exception.

### 1.      The Cause and Prejudice Exception

Ruiz contends that the procedural defaults of Claims 1, 2(c), 3(a), and 3(c) were the result of attorney error and, thus, should be excused. (*See generally*, R. 21.) "Cause" for purposes of excusing a procedural default "is an objective factor external to the defense that impeded the presentation of the claim to the state courts." *Booker v. Baker*, 74 F.4th 889, 894 (7th Cir. 2023) (citations omitted). "A factor is external to the defense if it 'cannot be fairly attributed to' the prisoner." *Davila*, 582 U.S. at 528 (quoting *Coleman*, 501 U.S. at 753). Attorney error may constitute an objective external factor that provides cause for excusing a default, but "only if that error amounted to a deprivation of the constitutional right to counsel." *Id.* (citing *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000)).

In this case, Ruiz attributes his procedural defaults to post-conviction counsel. But as discussed above, attorney error in postconviction proceedings does not constitute cause to excuse a procedural default because there is no Sixth Amendment right to counsel in collateral proceedings. *Davila*, 582 U.S. at 524; *Crutchfield*, 910 F.3d at 973. And though the Supreme Court carved out a limited exception to this rule in instances where, as a matter of state law, an ineffective assistance claim could be raised no sooner than postconviction proceedings but was not due to attorney error, that exception is not available to Illinois prisoners since state law permits *Strickland* claims on direct review. *See Booker v. Baker*, 74 F.4th 889, 894–95 (7th Cir. 2023)

13

(explaining unavailability of the exception enunciated in *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), to Illinois prisoners).

Ruiz, thus, cannot rely on any alleged error by postconviction counsel as cause to excuse his procedural defaults. Nor can he rely on any claimed error by direct appeal counsel because he did not properly exhaust an ineffective assistance of appellate counsel claim that corresponds to any of the defaulted claims. *See Mata v. Baker*, 74 F.4th 480, 488 (7th Cir. 2023) ("The assertion of ineffective assistance as cause to excuse a procedural default in a § 2254 petition, is, itself, a constitutional claim that must have been raised before the state court or be procedurally defaulted."). Accordingly, Ruiz cannot invoke the cause and prejudice exception to excuse any of his defaults.

### 2. The Fundamental Miscarriage of Justice Exception

The second way in which procedural default may be excused is via the fundamental miscarriage of justice, or actual innocence, exception. *See Coleman*, 501 U.S. at 750. "A habeas petitioner may use a claim of actual innocence to overcome a procedurally defaulted . . . habeas claim, as a way to prevent a miscarriage of justice." *Dixon v. Williams*, 93 F.4th 394, 403 (7th Cir. 2024), *reh'g denied,* No. 21-1375, 2024 WL 1510579 (7th Cir. Apr. 8, 2024). Proving actual innocence, however, is onerous. *Id.* The "standard is demanding and permits review only in the 'extraordinary' case." *House v. Bell*, 547 U.S. 518, 538 (2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). A petitioner does not establish actual innocence "unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would

14

have voted to find him guilty beyond a reasonable doubt." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2012) (citing *Schlup*, 513 U.S. at 329).

To pass through the actual-innocence gateway, the petitioner must support his claim with "reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324; *see also Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("To demonstrate innocence so convincingly that no reasonable jury could convict, a prisoner must have documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim."). "New evidence" in this context does not mean "newly discovered evidence," rather it is "any evidence that was not presented at trial." *Dixon*, 93 F.4th at 403. "In evaluating the claim, the court is to conduct a comprehensive assessment that takes into account any reliable evidence probative of petitioner's innocence or guilt, even evidence that was previously excluded." *Arnold v. Dittmann*, 901 F.3d 830, 837 (7th Cir. 2018).

The only evidence that Ruiz mentions in his habeas petition that was not presented at trial is the audio recording of Joe's 911 call and the evidence that Crystal had previously abused Christopher. (R. 1 at 13, 15–16.) During the 911 call, Crystal can be heard exclaiming, "I killed him, my Christopher." (*Id.* at 13.) In Ruiz' view, the 911 call coupled with the evidence of Crystal's prior abuse is exculpatory; it shows that Crystal was the sole perpetrator in Christopher's murder. (*Id.* at 12–13.) In the

Court's view, however, such evidence falls far short of meeting the demanding *Schlup* standard for actual innocence.

There was no dispute at trial that Crystal played a role in Christopher's death. The State argued that *both* Ruiz and Crystal struck Christoper, each causing injuries that contributed to his death. Alternatively, the State argued Ruiz was accountable for Crystal's acts of violence against Christopher. For his part, the State introduced evidence of Ruiz' own admissions. He apologized to Joe and Katrine for what he did to Christopher. And, during his custodial interrogation, he told the detectives that he lost control that night. He struck Christopher—multiple times and in multiple places. These admissions corresponded to the precise places on Christopher's body where Dr. Moser-Woertz testified that the child sustained significant internal and external injuries—many of which appeared to have been administered in the hours leading up to Christopher's death and all of which were fatal. The "new evidence" changes none of these facts.

To be sure, Ruiz tried to walk back some of his admissions when he took the stand. But the essential portions of the story that night did not change: Ruiz testified that he was present in the coach house when Crystal got home; things became heated; Christopher woke up in the middle of their argument; Ruiz struck Christopher; and a few hours later, Christopher was found dead with makeup covering up his bruises— makeup that Ruiz testified he applied. (*See* R. 13-16 at 34–96; R. 13-17 at 1–4 (Ruiz' trial testimony).) So, while evidence of Crystal's prior abuse and her statement on the 911 audio recording may have provided further evidence as to her role in the beating

16

death of Christopher, it does nothing to undermine Ruiz' own admitted role in the offense. And as Dr. Moser-Woertz testified, *all* of Christopher's injuries—whether inflicted by Crystal or (by his own admission) Ruiz—contributed to the child's death. Ruiz, therefore, cannot demonstrate "that more likely than not, in light of the new evidence, *no* reasonable juror would find him guilty beyond a reasonable doubt." *House*, 547 U.S. at 538 (emphasis added). Accordingly, he cannot establish actual innocence and, thus, cannot invoke the fundamental miscarriage of justice exception.

In sum, Ruiz cannot excuse the procedural defaults of Claims 2(c), 3(a), and 3(c). The Court, thus, cannot reach the merits of these claims. *See Perruquet v. Briley*, 390 F.3d 505, 522 (7th Cir. 2004). As such, Claims 2(c), 3(a), and 3(c) are denied.

## II. MERITS REVIEW

The Court now turns to its merits review of Ruiz' remaining claims: Claims 2(a), 2(b), and 3(b). In conducting this review, the Court looks to the decision of the Illinois Appellate Court on postconviction appeal, *Ruiz*, 2022 IL App (1st) 190947-U, as that is the last state court to address each of these claims in a reasoned decision on the merits. *See Pierce*, 93 F.4th at 1044–45.

### A. Ineffective Assistance of Counsel

Claims 2(a), 2(b), and 3(b) all assert ineffective assistance of counsel claims. Claims 2(a) and 2(b) allege that Ruiz' trial counsel rendered constitutionally ineffective assistance by failing to introduce the 911 audio recording and by failing to object to testimony about Ruiz isolating Crystal from her family. (R. 1 at 6.) Claim 3(b) attributes attorney error to Ruiz' appellate counsel for failing to raise an

ineffective assistance of trial counsel claim based on Claim 2(b) on direct appeal. (*Id.* at 15.)

Both ineffective assistance of trial and appellate counsel claims are governed by the two-prong test enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984).[5] *See Makiel v. Butler*, 782 F.3d 882, 897 (7th Cir. 2015) (citing *Smith v. Robbins*, 528 U.S. 259, 285 (2000)). *Strickland*'s two-prong test requires a showing of deficient performance by counsel and resulting prejudice. *See Premo v. Moore*, 562 U.S. 115, 118 (2011); *Thill v. Richardson*, 996 F.3d 469, 476 (7th Cir. 2021). Ruiz "is only entitled to habeas relief if he satisfies both of *Strickland*'s prongs." *Gage v. Richardson*, 978 F.3d 522, 537 (7th Cir. 2022).

"To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 688). "With respect to prejudice, a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the

---

[5] Ruiz argues that his ineffective assistance claims should be evaluated under *United States v. Cronic*, 466 U.S. 648 (1984). (R. 1 at 13–14, 15–16; R. 21 at 12–13.) *Cronic* recognized three "circumstances that are so likely to prejudice the accused" that they amount to a complete denial of counsel and prejudice is presumed, including: (1) when a defendant is denied the presence of counsel at a critical stage of proceedings; (2) when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; and (3) circumstances that are likely to prevent any lawyer, "even a fully competent one," from providing effective assistance. *Id.* at 658–60; *see also Reynolds v. Hepp*, 902 F.3d 699, 705 (7th Cir. 2018) (summarizing the three *Cronic* scenarios). Ruiz, however, never presented a *Cronic* claim for the *denial* of counsel to the state courts. He raised only ineffective assistance claims under *Strickland*. (*See* R. 13-6 at 21–27; R. 13-10 at 13–20; R. 13-11 at 86–88.) "The argument that he was denied counsel altogether is a different legal theory governed by a different legal rule—one that the [Illinois] courts did not have the chance to apply." *Reynolds*, 902 F.3d at 705. His attempt to reformulate his claim to benefit from *Cronic*'s presumption of prejudice on habeas corpus review "does not work." *Id.*

proceeding would have been different.'" *Id.* at 104 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

The Illinois Appellate Court determined that none of Ruiz' ineffective assistance of counsel claims could succeed because he failed to show that he was prejudiced by counsel's alleged errors. *Ruiz*, 2022 IL App (1st) 190947-U, ¶¶ 24, 37, 42, 44. In reaching this conclusion, the state appellate court identified *Strickland* as the relevant constitutional standard for ineffective assistance of both trial and appellate counsel. *Id.* ¶ 24. The state court also correctly articulated *Strickland*'s prejudice prong—noting that Ruiz must show a "'reasonable probability' that the result of the proceeding would have been different, if not for counsel's error(s)," and correctly defined the term "reasonable probability" as used in this context. *Compare id.* ¶ 24, *with Strickland*, 466 U.S. at 694. Nothing in the Illinois Appellate Court's analysis suggests that it diverted from, or used a standard that was "substantially different from or opposite to" *Strickland*'s prejudice prong in analyzing Ruiz' claims. *Thill*, 996 F.3d at 478. Ruiz, therefore, cannot show that the state appellate court's decision was "contrary to" *Strickland*. *See id.*; 28 U.S.C. § 2254(d)(1).

Nor can Ruiz show that the state appellate court's conclusion—that he was not prejudiced by his attorneys' alleged errors—was unreasonable. "The bar for establishing that a state court's application of the *Strickland* standard was 'unreasonable' is a high one, and only a clear error in applying *Strickland* will support a writ of habeas corpus." *Thill*, 996 F.3d at 478 (citation omitted). It is not enough to

simply show that "the state court's decision was wrong[;]" rather, for Ruiz to prevail, he must show that the state court decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* (quotation marks and citations omitted). Ruiz cannot make this showing.

As to his claim that trial counsel was ineffective for failing to introduce the audio recording of Joe's 911 call, the state appellate court explained:

> Given defendant's confession, the medical examiner's findings, the close correlation between the two, and the theory of joint contributing causation that was based on this evidence, we find no reason to believe that Crystal's statement might have changed the jury's conclusion that defendant, by his own admission, was one of the contributing causes of Christopher's death. Defendant has failed to show arguable prejudice, and his claim of ineffective assistance was properly dismissed on this basis.

*Id.* ¶ 37.

The Court recognizes that Ruiz' defense at trial was to point the finger at Crystal, and Crystal's statement overheard on the 911 audio recording would have provided additional evidence in support of such a defense. But, in making this argument, Ruiz overlooks the ample evidence, discussed above, of his own participation in the beating death of Christopher—be it through his statements to Joe and Katrine at the scene, his admissions during his custodial interrogation, or his testimony at trial. Unsurprisingly, the jury did not take him as an innocent bystander. Given the evidence of Ruiz' own guilt, there is no reasonable probability that introducing the 911 audio recording would have led to a different outcome.

The same is true of Ruiz' remaining ineffective assistance claims. As to his claim that trial counsel was ineffective for failing to object to evidence that Ruiz abused Crystal and isolated her from her family (and, relatedly, his claim that appellate counsel was ineffective for failing to raise the issue on direct appeal), the state appellate court reasoned:

> The circuit court properly dismissed this claim as well. Even if the jury heard irrelevant or needlessly unflattering evidence suggesting that defendant tried to isolate Crystal from her family, the fact remains that defendant confessed to beating Christopher on Thanksgiving, his admitted strikes closely correlated with the injuries found by the medical examiner, and those injuries were a contributing cause of death. It is not even arguable that the jury might have acquitted defendant, his corroborated confession notwithstanding, if only it hadn't heard evidence of Crystal's deteriorating family relations right around the time defendant entered the picture. Defendant has failed to show arguable prejudice.

*Id.* ¶ 42.

For the same reasons articulated above, there is no reasonable probability—in light of Ruiz' admissions regarding his own actions toward Christopher—that, but for the failure to object to this evidence, the result of Ruiz' trial would have been different. The state appellate court's finding of no *Strickland* prejudice was therefore not unreasonable, nor was it unreasonable for the state court to reject Ruiz' ineffective assistance of appellate counsel claim predicated on the same grounds. *See, e.g., Johnson v. Turner*, 624 F.3d 786, 793 (7th Cir. 2010) ("Because [petitioner's] appellate counsel claim is predicated on trial counsel's errors, the two claims rise and fall together.").

21

In sum, the state appellate court's conclusions as to Ruiz' ineffective assistance of counsel claims were neither "contrary to," nor an "unreasonable application" of *Strickland*'s prejudice prong. 28 U.S.C. § 2254(d)(1). The Court therefore need not address *Strickland*'s performance prong. *See Thill*, 996 F.3d at 476 (declining to address *Strickland*'s performance prong where petitioner's prejudice-prong arguments failed); *Gage*, 978 F.3d at 527 (declining to analyze deficient performance because the state appellate court "did not unreasonably apply *Strickland*'s prejudice prong"); *see also Taylor v. Bradley*, 448 F.3d 942, 949 (7th Cir. 2006) (noting that "it is unnecessary and undesirable for [a habeas court] to consider the attorney performance facet of the analysis" when "an ineffectiveness claim may be disposed of on the basis of a lack of prejudice"). Ruiz' arguments as to his entitlement to federal habeas corpus relief are meritless. Claims 2(a), 2(b), and 3(b) are therefore denied.

## III.  EVIDENTIARY HEARING

As an alternative to habeas relief, Ruiz requests the Court hold an evidentiary hearing on his claims. (R. 1 at 17.) The Court's "review of legal claims under § 2254(d)(1) is . . . 'limited to the record that was before the state court[,]'" *Shoop v. Twyford*, 596 U.S. 811, 819 (2022) (quoting *Pinholster*, 563 U.S. at 181), as is the Court's "[r]eview of factual determinations under § 2254(d)(2)." *Id.* "In other words, 'no federal evidentiary hearing is permitted when the state court has already addressed the issue; rather, 'the record under review is limited to . . . the record before the state court.'" *Westray v. Brookhart*, 36 F.4th 737, 754 (7th Cir. 2022) (citing *Stechauner v. Smith*, 852 F.3d 708, 721 (7th Cir. 2017) (quoting *Pinholster*, 563 U.S.

at 182)). Only if the AEDPA "poses no bar" to relief may the Court consider whether an evidentiary hearing is warranted. *See id.*

As discussed above, the Illinois Appellate Court adjudicated Ruiz' non-defaulted ineffective assistance of trial and appellate counsel claims on the merits. Ruiz failed to establish either that the state appellate court's decision was "contrary to" or involved an "unreasonable application" of *Strickland*. *See* 28 U.S.C. § 2254(d)(1). And, because the record supports the state court's findings, Ruiz cannot demonstrate that the decision involved an "unreasonable determination of the facts." *See* 28 U.S.C. § 2254(d)(2). "The AEDPA therefore bars an evidentiary hearing" in this case, and the "analysis need not go further." *Westray*, 36 F.4th at 754. Ruiz' motion for an evidentiary hearing is denied.

In sum, this Court cannot grant federal habeas relief on any of Ruiz' claims because they are either procedurally defaulted or meritless. His habeas corpus petition is therefore denied.

## IV.    CERTIFICATE OF APPEALABILITY AND NOTICE OF APPEAL RIGHTS

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, the Court must issue or deny a certificate of appealability when it enters a final order adverse to a habeas petitioner. A certificate of appealability shall issue only if the petitioner can make a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing 28 U.S.C. § 2253(c)(2)). To do so, the petitioner must show that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or

that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). Here, there is no substantial constitutional question for appeal because reasonable jurists would not find this Court's procedural rulings nor its assessment of Ruiz' constitutional claims debatable or wrong. *See Lavin v. Rednour*, 641 F.3d 830, 832 (7th Cir. 2011) (citing *Slack*, 529 U.S. at 484–85). For these reasons, the Court declines to issue a certificate of appealability.

Ruiz is advised that this is a final decision ending his case in this Court. If Ruiz wishes to appeal, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(1). Ruiz need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if Ruiz wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. Fed. R. App. P. 4(a)(4)(A)(vi).

24

**CONCLUSION**

Petitioner Cesar Ruiz' habeas corpus petition [1, 8] is denied. Any other pending motions are denied as moot. The Court declines to issue a certificate of appealability. Judgment shall be entered in favor of the respondent and against the petitioner. Civil case terminated.

Date: August 5, 2024

_____
JEREMY C. DANIEL
United States District Judge